[No. B212524. Second Dist., Div. Six. Oct. 14, 2009.]

SUSTAINABLE TRANSPORTATION ADVOCATES OF SANTA
BARBARA, Plaintiff and Appellant, v.
SANTA BARBARA COUNTY ASSOCIATION OF GOVERNMENTS,
Defendant and Respondent.

**COUNSEL**

Eugene S. Wilson for Plaintiff and Appellant.

Dennis Marshall, County Counsel, Kevin E. Ready, Sr., Deputy County Counsel; Remy, Thomas, Moose and Manley, Whitman F. Manley, Tiffany K. Wright and Christopher J. Butcher for Defendant and Respondent.

**OPINION**

**PERREN, J.**—Sustainable Transportation Advocates of Santa Barbara appeals from a judgment denying its petition for a writ of mandate. Appellant sought to vacate the approval of Measure A by the Santa Barbara County Association of Governments (respondent). Measure A, entitled the "Santa Barbara County Road Repair, Traffic Relief, and Transportation Safety Measure," imposes a retail sales and use tax to fund transportation projects in Santa Barbara County. Respondent approved Measure A without conducting environmental review pursuant to the California Environmental Quality Act (CEQA; Pub. Resource Code, § 21000 et seq.). After respondent's approval,

Measure A was adopted by the voters at the General Election on November 4, 2008. Appellant contends that Measure A is invalid because there was no environmental review before respondent approved it. We disagree and affirm.

*Background*

Respondent "is the local transportation authority for [Santa Barbara County] with the power, subject to voter approval, to impose a sales or use tax of up to 1 percent to provide funding for transportation services in the county. (Pub. Util. Code, § 180000 et seq.)" (*Santa Barbara County Coalition Against Automobile Subsidies v. Santa Barbara County Assn. of Governments* (2008) 167 Cal.App.4th 1229, 1234 [84 Cal.Rptr.3d 714].) On June 19, 2008, respondent approved Measure A, consisting of Ordinance No. 5 (Ordinance) and a document entitled "Transportation Investment Plan" (Investment Plan). On the same date, respondent adopted a resolution requesting that the Santa Barbara County Board of Supervisors call an election on November 4, 2008, for the purpose of allowing the electorate to vote on Measure A.

The Ordinance extends "for a period not to exceed thirty years" an existing one-half of 1 percent local transportation sales and use tax. The existing sales and use tax will expire on March 31, 2010. The Ordinance provides that the Investment Plan "is hereby adopted as the County Transportation Expenditure Plan ('Expenditure Plan') for the expenditure of revenues expected to be derived from the tax imposed pursuant to this Ordinance, in accordance with California Public Utilities Code Section 180206." Section 180206 provides that, prior to the call of an election to approve a local transportation sales and use tax, an expenditure plan shall be prepared and adopted. The expenditure plan must show "the expenditure of the revenues expected to be derived from the tax imposed . . . , together with other federal, state, and local funds expected to be available for transportation improvements, for the period during which the tax is to be imposed." (*Id.*, subd. (a).)

The Investment Plan notes that Measure A is expected to generate revenue of $1.05 billion over a period of 30 years, which will be matched by "an estimated $522 million in federal and state gas taxes, developer fees and contributions from neighboring counties." The Investment Plan sets forth the transportation projects to be funded by Measure A revenue.

On July 1, 2008, appellant filed a petition for a writ of mandate in the trial court. Appellant sought to vacate respondent's approval of Measure A because it had not conducted prior CEQA environmental review. Appellant alleged that such review was required because Measure A is a project within the meaning of CEQA and respondent had committed itself to the implementation of the project.

*Basic CEQA Principles*

■ "With narrow exceptions, CEQA requires an EIR [environmental impact report] whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390–391 [253 Cal.Rptr. 426, 764, P.2d 278], fn. omitted.) " 'Approval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." (CEQA Guidelines, Cal. Code Regs., tit. 14, § 15352, subd. (a).)[1] "An activity that is not a 'project' as defined in the Public Resources Code (see § 21065) and the CEQA Guidelines (see § 15378) is not subject to CEQA. (CEQA Guidelines, § 15060, subd. (c)(3).)" (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.,* *supra,* 41 Cal.4th at p. 380.)

*Trial Court's Ruling*

■ The trial court determined that, pursuant to CEQA Guidelines section 15378, subdivision (b)(4), Measure A does not qualify as a project. Section 15378, subdivision (b)(4), provides that a project for purposes of CEQA does not include "[t]he creation of government funding mechanisms or other government fiscal activities, which do not involve any commitment to any specific project which may result in a potentially significant physical impact on the environment." The trial court noted that "Measure A is indisputably a governmental funding mechanism . . . ." The court concluded that Measure A falls within the funding mechanism exclusion of the CEQA Guidelines because it "does not constitute a binding commitment to construct the projects set forth in the investment plan."

The trial court's ruling was consistent with section 14 of the Ordinance, which provides in part: "Pursuant to the State CEQA Guidelines section 15378(b)(4), adoption of this retail transactions and use tax ordinance as a government funding mechanism is not a project subject to the requirements of CEQA."

---

[1] "The term 'CEQA Guidelines' refers to the regulations for the implementation of CEQA authorized by the Legislature (Pub. Resources Code, § 21083), codified in title 14, section 15000 et seq. of the California Code of Regulations, and 'prescribed by the Secretary of Resources to be followed by all state and local agencies in California in the implementation of [CEQA].' (CEQA Guidelines, § 15000.) In interpreting CEQA, we accord the CEQA Guidelines great weight except where they are clearly unauthorized or erroneous. [Citation.]" (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380, fn. 2 [60 Cal.Rptr.3d 247, 160 P.3d 116].)

*Mootness*

■ On September 18, 2008, three months after its approval of Measure A, respondent certified a final EIR (environmental impact report) for the 2008 Santa Barbara County Regional Transportation Plan. A regional transportation plan is deemed to be a project for purposes of CEQA, so an EIR is required prior to its adoption. (See *Edna Valley Assn. v. San Luis Obispo County etc. Coordinating Council* (1977) 67 Cal.App.3d 444, 447–449 [136 Cal.Rptr. 665].) The final EIR purported to consider all of the projects in the Investment Plan. Respondent argues that, since "the voters had an opportunity to review [the final EIR] before the November election, there is no effective remedy this court can offer that has not already been implemented. At this point, a ruling requiring [respondent] to conduct environmental review on Measure A would be 'purely academic,' as no practical relief can result." Therefore, respondent contends, "[t]he case is moot." "An appeal becomes moot when, through no fault of the respondent, the occurrence of an event renders it impossible for the appellate court to grant the appellant effective relief. [Citations.]" (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054–1055 [81 Cal.Rptr.3d 556].)

■ The appeal is not moot. If Measure A constituted a project within the meaning of CEQA and if respondent approved that project on June 19, 2008, environmental review would have been required prior to its approval, not three months later. "CEQA [should] not be interpreted as allowing an EIR to be delayed beyond the time when it can, as a practical matter, serve its intended function of informing and guiding decision makers." (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 130 [84 Cal.Rptr.3d 614, 194 P.3d 344] (*Save Tara*).) "[A]t a minimum an EIR must be performed before a project is approved, for '[i]f postapproval environmental review were allowed, EIR's would likely become nothing more than *post hoc* rationalizations to support action already taken.' " (*Ibid.*) If an EIR is prepared after the approval of a project subject to CEQA, the approval must be vacated. (45 Cal.4th at pp. 127–128, 143.) Thus, respondent's certification of a final EIR after its approval of Measure A does not preclude this court from granting appellant effective relief. (45 Cal.4th at pp. 127–128.)

Moreover, on October 15, 2008, appellant filed in the trial court a petition for a writ of mandate challenging the adequacy of the final EIR. (*Sustainable Transportation Advocates of Santa Barbara v. Santa Barbara County Assn. of*

*Governments* (Super. Ct. Santa Barbara County, No. 1303310) (petn. pending).)[2] If appellant prevails in the trial court proceeding, respondent's certification of the final EIR will be set aside. Accordingly, we consider the instant appeal on its merits.

### Standard of Review

"Whether an activity constitutes a project under CEQA is a question of law that can be decided de novo based on the undisputed evidence in the record. [Citation.]" (*Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1412–1413 [22 Cal.Rptr.3d 393]; accord, *Muzzy Ranch Co. v. Solano County Airport Land Use Com., supra*, 41 Cal.4th at p. 382.) The instant appeal, therefore, " '. . . presents no question of deference to agency discretion or review of substantiality of evidence. [Citation.]' [Citation.]" (*Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 637 [10 Cal.Rptr.3d 560].)

### Discussion

█ Section 14 of the Ordinance provides: "Prior to commencement of any project included in the Investment Plan, any necessary environmental review required by CEQA shall be completed." In *Save Tara, supra*, 45 Cal.4th 116, our Supreme Court considered the impact of a similar CEQA compliance condition in an agency's agreement allowing private development. The court concluded that the agreement's "conditioning of final approval on CEQA compliance is relevant but not determinative" in deciding whether a public agency has committed itself to, and therefore approved, a project. (45 Cal.4th at p. 139.) Such a condition "can be a legitimate ingredient in a preliminary public-private agreement for exploration of a proposed project, but if the agreement, viewed in light of all the surrounding circumstances, commits the public agency as a practical matter to the project, the simple insertion of a CEQA compliance condition will not save the agreement from being considered an approval requiring prior environmental review." (*Id.* at p. 132.) The court applied "the general principle that before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.' [Citations.]" (*Id.* at p. 138.)

Although the *Save Tara* court's analysis was made in the context of an agency's agreement allowing private development, that analysis is appropriate here as well. In approving Measure A, respondent did not significantly

---

[2] Pursuant to Evidence Code sections 452, subdivision (d), and 459, we take judicial notice of the petition for a writ of mandate.

further the Investment Plan's projects " 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review . . . .' " (*Save Tara, supra*, 45 Cal.4th at p. 138.) The Investment Plan gives a brief, general description of these projects without providing details or specifications. For example, in describing the $140 million investment in the project to widen Highway 101, the Investment Plan states: "This project will widen Highway 101 from 4 to 6 lanes between the city of Carpinteria and the city of Santa Barbara to improve safety, reduce traffic congestion and match the 6 lane highway south of Carpinteria and north of Santa Barbara." In describing the $20 million investment in the project to add passing lanes on Highway 246, the Investment Plan states that the project will "[i]mprove the traffic safety and operations on Highway 246 between Buellton and Lompoc by adding passing lanes and turning lanes between Purisima and Domingos Roads." In describing the $10 million investment in the project at the McCoy interchange on Highway 101, the Investment Plan states that the project will "[c]onnect McCoy Lane to Highway 101 through a new interchange including northbound and southbound on and off ramps to provide Santa Maria residents and businesses with improved access to the highway." The lack of details and specifications allows flexibility to meet mitigation measures set forth in a subsequent EIR.

Moreover, the Ordinance provides that respondent may amend the Investment Plan "to provide for the use of additional federal, state and local funds, to account for unexpected revenues, to add or delete a project or program from the plan, to maintain consistency with the Santa Barbara County Regional Transportation Plan, or to take into consideration unforeseen circumstances." An amendment "must be passed by a two-thirds majority of [respondent's members] by a roll call vote." Respondent's retention of the power to amend the Investment Plan, including the power to "delete" a project, indicates that it had not "committed itself to [any] project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project." (*Save Tara, supra*, 45 Cal.4th at p. 139; see also CEQA Guidelines, § 15126.6, subd. (e)(1) [EIR must consider "[t]he specific alternative of 'no project' . . . along with its impact"].)

In an e-mail sent in February 2008, James Kemp, respondent's executive director, explained why a broad power of amendment was necessary: "It would be impractical and expensive to go back to the voters any time an amendment is needed . . . . For example, let's say an interchange project becomes infeasible or simply unnecessary (not unprecedented nor unlikely during a 30 year measure)—we'd have to place a measure on the ballot and have a countywide vote to reallocate the funds to another project . . . ."

Appellant argues that Public Utilities Code section 180207, subdivision (a), provides the exclusive grounds for amending the Investment Plan. Section 180207, subdivision (a), provides: "The authority may annually review and propose amendments to the county transportation expenditure plan adopted pursuant to Section 180206 to provide for the use of additional federal, state, and local funds, to account for unexpected revenues, or to take into consideration unforeseen circumstances." We need not decide whether these statutory grounds for amendment are exclusive. The ground of "unforeseen circumstances" can reasonably be construed as including circumstances that come to light as a result of subsequent CEQA environmental review. The electorate was put on notice that such review might result in changes to the projects. In his analysis of Measure A in the Santa Barbara County voter sample ballot, county counsel states: "All projects funded by the ordinance must be consistent with . . . the California Environmental Quality Act."

In determining whether respondent committed itself to the proposed projects, we also consider that their implementation is conditioned upon the receipt of substantial matching funds from other sources. For example, the project to widen Highway 101 will require matching funds of $285 million, the project to add passing lanes on Highway 246 will require matching funds of $30 million, and the project at the McCoy interchange on Highway 101 will require matching funds of $15 million. For each of these projects, the matching funds exceed the funds derived from the Measure A sales and use tax. In view of the need for substantial matching funds, the adoption of Measure A by the electorate does not assure that the proposed projects will be implemented.

Appellant argues that respondent's "staff conducted an extensive campaign in support of Measure A over more than a year's time expressing the agency's commitment to Measure A and the projects specified in it." "Having recommended the measure to the voters, [respondent was] not in a position to change the approved projects in order to accommodate an EIR." But respondent's support of Measure A and the proposed projects does not transform the measure into a project for purposes of CEQA. An agency does not commit itself to a project "simply by being a proponent or advocate of the project." (*City of Vernon v. Board of Harbor Comrs.* (1998) 63 Cal.App.4th 677, 688 [74 Cal.Rptr.2d 497], disapproved on other grounds in *Save Tara, supra,* 45 Cal.4th at p. 131, fn. 10.) " 'If having high esteem for a project before preparing an environmental impact report (EIR) nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will be favorably disposed toward it.' [Citation.]" (*Save Tara, supra,* at pp. 136–137.)

We reject appellant's contention that the text of Measure A indicates no intention to perform any future environmental review. Appellant overlooks

the significance of section 14 of the Ordinance, which provides that "any necessary environmental review required by CEQA shall be completed" before a specific project is commenced.

*Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165 [105 Cal.Rptr.2d 214, 19 P.3d 567], is distinguishable. In that case a city council decided to submit a ballot measure to the voters for approval. The measure would enact an ordinance removing 29 structures from the city's register of historic resources and landmarks. Our Supreme Court concluded that the measure was a project subject to CEQA. Therefore, the city council was required to conduct environmental review before placing it on the ballot. (25 Cal.4th at pp. 171, 191.) Unlike Measure A, the ballot measure in *Friends of Sierra Madre* committed the city to the delisting of the 29 structures if the voters passed it.

Appellant's position is not supported by *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779 [187 Cal.Rptr. 398, 654 P.2d 168] (*Fullerton*). In *Fullerton* the State Board of Education (Board) approved a plan to carve a new Yorba Linda Unified School District out of the existing Fullerton Joint Union High School District (Fullerton HSD) and to transfer Yorba Linda students to the new district. The Board directed that the plan be submitted for approval to Yorba Linda voters. Our Supreme Court concluded that the plan was a project within the meaning of CEQA. Environmental review was therefore required before the Board approved the plan and submitted it to the voters, even though "[s]pecific plans [had] not yet been formulated for construction of a new high school in Yorba Linda or for changes in the education program in the remaining portion of the Fullerton HSD." (32 Cal.3d at p. 797.) The problem with delaying environmental review until after the election "is that as a practical matter it precludes the alternative of continuing the status quo. Once the voters approve the secession Plan the new Yorba Linda Unified School District will have to build a high school, and Fullerton HSD will have to adjust to the loss of the Yorba Linda students." (*Ibid.*)[3] Unlike the ballot measure in *Fullerton*, the voters' approval of Measure A does not require the implementation of the projects set forth in the Investment Plan.

*Save Tara, supra*, 45 Cal.4th 116, is also distinguishable. In *Save Tara*, the City of West Hollywood (City) agreed to allow a private developer to redevelop property for senior housing. The agreement was conditioned on future compliance with CEQA. Our Supreme Court concluded that, because City had committed itself to the project, it was required to prepare and

---

[3] *Fullerton* was questioned on another point in *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 918 [13 Cal.Rptr.2d 245, 838 P.2d 1198].

consider an EIR before entering into the agreement. In reaching this conclusion, the court considered the following factors: (1) City "agreed to initially lend the developer nearly half a million dollars, a promise *not* conditioned on CEQA compliance." (45 Cal.4th at p. 140.) If City "did not give final approval to the project, . . . it would not be repaid." (*Ibid.*) (2) The agreement provided that "whether CEQA requirements had been met was to be 'reasonably determined by the City Manager,' language that could have left City open to charges it acted unreasonably, had it ultimately declined to certify the EIR or make any needed CEQA findings." (*Ibid.*) (3) The agreement "had no provision for appealing to the city council the city manager's decision on, or waiver of, CEQA compliance. Such a delegation of the council's authority was itself an impermissible attempt to approve the project without prior CEQA review. [Citation.]" (*Id.* at p. 141.) (4) The agreement "arguably left open the question whether City remained free to find that the EIR was legally adequate and yet to reject the project on substantive environmental grounds." (*Id.* at p. 140.) (5) City made "public announcements that it was determined to proceed with the development" of the project. (*Id.* at p. 142.) For example, City officials said that "City 'must continue on a path that fulfills this obligation' to redevelop the property for senior housing" and that "other uses of the property . . . had already been ruled out." (*Id.* at pp. 141–142, fn. omitted.) (6) "City proceeded with tenant relocation on the assumption the property would be redeveloped as in the proposed project. . . . [¶] Relocation of tenants is a significant step in a redevelopment project's progress, and one that is likely to be irreversible. City's willingness to begin that process as soon as the conditional development agreement was executed, and to complete it before certifying an EIR and finally approving the project, tends strongly to show that City's commitment to the . . . project was not contingent on review of an EIR." (*Id.* at p. 142.)

■ Unlike City's actions in *Save Tara*, respondent's actions did not demonstrate that, as a practical matter, it had committed itself to the implementation of the transportation projects in the Investment Plan. Measure A does not qualify as a project within the meaning of CEQA because it is a mechanism for funding proposed projects that may be modified or not implemented depending upon a number of factors, including CEQA environmental review. (CEQA Guidelines, § 15378, subd. (b)(4).) In approving Measure A, respondent was "performing its legislative duty to obtain financing for county transportation needs." (*Santa Barbara County Coalition Against Automobile Subsidies v. Santa Barbara County Assn. of Governments, supra,* 167 Cal.App.4th at p. 1240.) ■ In adopting the Investment Plan, respondent was merely complying with the statutory requirement that, prior to the call of an election to approve a local transportation sales and use tax, "[a] county transportation expenditure plan shall be prepared for the expenditure of the revenues expected to be derived from the tax imposed . . . ." (Pub.

Util. Code, § 180206, subd. (a).) Without such a plan, the electorate would lack sufficient information to intelligently vote on whether to impose a local transportation sales and use tax. Thus, the Investment Plan functioned as an informative document rather than a commitment by respondent to the projects specified in the plan.

## Disposition

The judgment is affirmed. Respondent shall recover its costs on appeal.

Gilbert, P. J., and Yegan, J., concurred.

A petition for a rehearing was denied November 10, 2009, and appellant's petition for review by the Supreme Court was denied February 18, 2010, S178766.