[No. B233859. Second Dist., Div. Three. Oct. 23, 2012.]

WING Y. CHUNG, Plaintiff and Appellant, v.
CITY OF MONTEREY PARK, Defendant and Respondent.

COUNSEL

Gibson, Dunn & Crutcher, Robert E. Palmer, Alan N. Bick, Lauren Friedman; Bell, McAndrews & Hiltachk, Paul T. Gough and Thomas W. Hiltachk for Plaintiff and Appellant.

Jenkins & Hogin, Mark D. Hensley, Christi Hogin; and Robert M. Smith, City Attorney, for Defendant and Respondent.

OPINION

**KLEIN, P. J.**—Plaintiff and appellant Wing Y. Chung (Chung) appeals a judgment denying his petition for writ of mandate and declaratory relief. Chung sought to invalidate Measure BB, approved by the voters of defendant and respondent City of Monterey Park (the City). Measure BB established a competitive bidding for future trash service contracts, to be used after the existing trash service contract, currently held by Athens Services (Athens), expires in 2017.

The essential issue presented is whether the Monterey Park City Council's (City Council) decision to place Measure BB on the ballot required prior environmental review pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).

The trial court properly determined that Measure BB was not a "project" within the meaning of CEQA and therefore the measure did not require environmental review before being placed on the ballot. The judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *City voters approve Measure BB, placed on the ballot by the City Council, adopting competitive bidding for trash hauling services.*

On November 3, 2010, the City Council directed staff to prepare a ballot measure that would require the City to seek competitive bids for trash service when Athens's current contract expired in 2017, and thereafter require the City to competitively bid for trash service every five years.

Two weeks later, on November 17, 2010, the City Council met to address the issue further. Athens was represented at the meeting by its counsel. In opposing the proposed ballot measure, Athens asserted the measure was a "project" within the meaning of CEQA so as to require environmental review,

and that the measure would improperly and imprudently "bind a future council" in 2017, when the current contract would expire.

The city attorney, in turn, opined this was not a project for purposes of CEQA. Further, the ballot measure was clear with respect to compliance with future environmental laws; the successful bidder would be required to comply with applicable legal requirements. As for whether Measure BB could be amended at a later date, the city attorney stated: "If this is placed on the ballot, and it's approved by the voters, a future Council cannot change this language in this ordinance. It could only be approved by, or changed through a subsequent vote of the people."

At the conclusion of the public hearing, the City Council unanimously voted to place the measure on the March 8, 2011 municipal ballot.

After the City Council voted to submit Measure BB to the voters, Athens submitted a letter to the City reiterating its arguments that the proposal to require competitive bidding was in violation of CEQA. Measure BB, among other things, would require the City Council to award the residential solid waste franchise to a single franchisee, but the City Council "may, at its discretion, award the commercial solid waste Franchise to *up to three franchisees*." (Italics added.) Therefore, Measure BB raised concerns about air quality, noise pollution and road damage that would likely result from an increase in the size of the solid waste contractor fleet serving the City.

On March 8, 2011, City voters approved Measure BB, with over 71 percent voting in favor of establishing a competitive bidding process.[1]

 2. *Proceedings.*

 a. *Petition for writ of mandate and complaint for declaratory relief.*

Chung is a voter and resident of the City, and was a signatory to the ballot arguments against Measure BB. Prior to the municipal election, on December 21, 2010, Chung filed a petition for writ of mandate (Code Civ. Proc., §§ 1085, 1094.5) and complaint for declaratory relief.

---

[1] The ballot arguments in support of Measure BB stated, inter alia: "Monterey Park residents and businesses are paying the higher trash fees under a long fifteen-year sole source contract awarded without going to competitive bid. [¶] This ballot measure will STOP THE CORRUPTION and ELIMINATE THE FAVORITISM that has occurred in cities, such as Carson, where council members were found guilty of receiving $$$,$$$ bribes for their award of trash contracts. [¶] This ballot measure will provide residents and businesses with the LOWEST COSTS for QUALITY TRASH SERVICE."

Chung alleged Measure BB is a "project" subject to CEQA, and the City violated CEQA by failing to make any decision as to whether Measure BB would have a significant impact upon the environment, failing to consider any alternatives or mitigating measures, and failing to conduct the requisite informed decision making under CEQA.

Chung further pled that by placing Measure BB on the ballot as an "Initiative Measure," when in fact it was nothing more than a municipal ordinance, the current City Council was purporting to strip a future city council of the ability to amend Measure BB. "By placing Measure BB on the ballot as an 'initiative,' the current Monterey Park City Council is attempting to characterize Measure BB as a true initiative measure in the hope that future city councils will be unable to change or amend the terms of Measure BB without a further vote of the people, thereby attempting to do indirectly what they cannot do directly."

Chung sought the issuance of a writ of mandate to remove Measure BB from the ballot due to the City's noncompliance with CEQA.

Chung also requested declaratory relief in the event Measure BB remained on the ballot and was approved by the voters, seeking to have Measure BB declared void as an unconstitutional ordinance. Chung asserted that although the City had deemed Measure BB a voter "initiative," Measure BB was not submitted by way of initiative petitions as required by Elections Code section 9201 et seq. and therefore was not a valid initiative. Therefore, Measure BB should be held unconstitutional insofar as it attempted to restrict the discretionary acts of future council members.

b. *Opposition papers.*

The City contended the ballot measure did not require environmental review under CEQA because it merely proposed a different method for selecting future trash service providers for the City. The competitive bidding process that would be established by the measure was not considered a "project" within the meaning of CEQA. Further, even if Measure BB were a project, it would be exempt under the general rule that CEQA applies only to projects that have the potential for causing a significant effect on the environment. This ballot measure, which would take effect in 2017, did not commit the City to any particular plan of action or service provider or foreclose any alternatives available to the City when the time came to select a new provider. Therefore, to the extent there were any environmental impacts that may result from some future action under Measure BB, such impacts were too speculative at this time to justify environmental review. Further,

there was no evidence in the record that the ballot measure would result in significant impacts to the physical environment that would trigger a need for environmental review.

The City further argued the City Council's action did not bind the discretion of future City Councils. The City Council's only action was to place Measure BB on the ballot. The decision to adopt Measure BB, so as to establish competitive bidding for trash service contracts, was left completely up to the voters. Measure BB was a ballot measure rather than an "initiative" within the meaning of the Elections Code; even though some of the ballot materials referred to Measure BB as an initiative, that was insignificant because the words had no meaningful difference to the voters and therefore "the imprecise identification [was] not false or misleading." Therefore, Chung's petition should be denied.

c. *Trial court's ruling.*

On April 27, 2011, the matter came on for hearing and was taken under submission. The trial court then issued a written ruling denying Chung's petition. The trial court's order stated in pertinent part:

"Monterey Park City Council decided to place a measure on the March 8, 2011 ballot which would establish standards governing the award of future trash service contracts and require that such contract be awarded through a competitive bid process. No initial study was done and there was no Notice of Exemption. There was a hearing and the public did have the opportunity to object. Relying on the city attorney's opinion that the ballot measure was not a project requiring CEQA review, the City Council submitted the ballot measure to the voters. The measure was overwhelmingly approved by voters on March 8, 2011.

"[Chung] alleges that (1) the measure was placed on the ballot without the necessary CEQA environmental review and; (2) by limiting future City Council discretion, the Measure is unconstitutional or is an 'improperly disguised ordinance.' [¶] . . . [¶]

". . . CEQA applies if the activity is a 'project' under the statutory definition, unless the project is exempt. [(Pub. Resources Code], §§ 21065, 21080.[)] An activity is a project subject to CEQA if it may cause either a direct physical change of the environment, or a reasonably foreseeable indirect physical change in the environment. [(*Id.*], § 21065.[)] A project for CEQA purposes does not include the creation of government funding mechanisms or other government fiscal activities which do not involve any commitment to any specific project which may result in a potentially significant

impact on the environment. 14 CCR § 15378(b)(4). 'Courts are statutorily prohibited from interpreting CEQA in a manner which imposes procedural or substantive requirements beyond those explicitly stated.' [Citation.] The city attorney expressed the opinion that the ballot measure addresses only a procedural matter and that any service provider would still be required to comply with state law requirements, including waste diversion requirements and air emission restrictions. This court agrees and finds that the ballot measure does not constitute a project."

The trial court further held that "[e]ven if the activity was considered to be a project, the 'common sense' exemption would apply here. See 14 CCR § 15061(b)(3) ('Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA.'). As the name 'common sense' implies, there may be no evidence, substantial or otherwise, to support the conclusion that it applies. The exemption, as used here, merely confirms by definition that the activity is not a project. However, as with any categorical exemption, the burden is on the petitioner to show that an exception to the exemption applies. [Citation.] The 'common sense' exemption does not, however, share the premise that an entire class of project ordinarily has no significant environmental effects. [Citation.] The required burden of a party challenging this exemption is slight. [Citation.] [Chung] did not meet even this slight burden and has not raised a reasonable argument to suggest a possibility of an adverse impact. There is no fair argument in the record that the proposed measure alone would reasonably result in a foreseeable increase in trucks servicing the City. [¶] The court finds that the City fully complied with the requirements of the California Environmental Quality Act and denies the petition for writ of mandate.

"The court also finds that Measure BB was properly submitted to the voters. The matter was clearly a 'ballot measure' even though some election materials described it as an initiative. The court declines to issue an advisory opinion on whether repeal or amendment of the measure would require voter approval. Until the Council acts to amend or repeal the measure, the controversy is not ripe."

On May 4, 2011, the trial court entered judgment denying Chung's petition for writ of mandate and declaratory relief. This timely appeal followed.

## CONTENTIONS

Chung contends: (1) the trial court erred in holding Chung's request for declaratory relief was not ripe and in refusing to enter a declaratory judgment confirming that, despite being improperly labeled an initiative, Measure BB

was a ballot measure that could be amended by the City Council in the future without a further public vote, and (2) the trial court erred in holding the City's decision to place Measure BB on the ballot was not a project and/or was exempt from CEQA.

## DISCUSSION

1. *The City Council's decision placing Measure BB on the ballot was not a project within the meaning of CEQA.*

 a. *Standard of review.*

In the present case, the principal controversy is whether the City Council's decision placing Measure BB on the ballot constitutes a "project" within the purview of CEQA. This is an issue of law which can be decided on undisputed data in the record on appeal; thus the present appeal presents no question of deference to agency discretion or review of substantiality of evidence. (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 794–795 [187 Cal.Rptr. 398, 654 P.2d 168], criticized on other grounds in *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 918 [13 Cal.Rptr.2d 245, 838 P.2d 1198]; *Friends of the Sierra Railroad v. Tuolumne Park & Recreation Dist.* (2007) 147 Cal.App.4th 643, 652 [54 Cal.Rptr.3d 500].)

 b. *Basic CEQA principles; the definition of a "project" within the meaning of CEQA excludes government fiscal activities which do not involve a commitment to a specific project.*

█ " 'With narrow exceptions, CEQA requires an EIR [environmental impact report] whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.]' (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390–391 [253 Cal.Rptr. 426, 764 P.2d 278], fn. omitted.) ' "Approval" means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person.' (CEQA Guidelines, Cal. Code Regs., tit. 14, § 15352, subd. (a).)[2] █ 'An activity that is not a "project" as defined in the Public Resources Code (see § 21065) and the CEQA Guidelines (see § 15378) is not subject to CEQA. (CEQA Guidelines, § 15060, subd. (c)(3).)' (*Muzzy Ranch Co. v. Solano County Airport Land Use Com., supra,* 41 Cal.4th

---

[2] "The term 'CEQA Guidelines' refers to the regulations for the implementation of CEQA authorized by the Legislature (Pub. Resources Code, § 21083), codified in title 14, section 15000 et seq. of the California Code of Regulations, and 'prescribed by the Secretary for Resources to be followed by all state and local agencies in California in the implementation of

at p. 380.)" (*Sustainable Transportation Advocates of Santa Barbara v. Santa Barbara County Assn. of Governments* (2009) 179 Cal.App.4th 113, 117 [101 Cal.Rptr.3d 371] (*Sustainable Transportation*).)

CEQA defines "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Pub. Resources Code, § 21065.)

The CEQA guidelines elaborate on this definition and provide a project does not include the "creation of government funding mechanisms *or other government fiscal activities*, which do not involve any commitment to any specific project which may result in a potentially significant physical impact on the environment." (Cal. Code Regs., tit. 14, § 15378, subd. (b)(4), italics added.)

> c. *The adoption of competitive bidding in municipal contracts is a fiscal activity, promoting competition and eliminating favoritism, fraud and corruption in the awarding of public contracts.*

■ It is settled that " ' "[t]he provisions of statutes, charters and ordinances requiring competitive bidding in the letting of municipal contracts are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable . . . ." ' (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 173 [36 Cal.Rptr.2d 521, 885 P.2d 934]; Pub. Contract Code[,] § 100, subds. (b)–(d) [Legislature's intent in enacting Public Contract Code includes 'ensur[ing] full compliance with competitive bidding statutes as a means of protecting the public from misuse of public funds,' 'provid[ing] all qualified bidders with a fair opportunity to enter the bidding process, *thereby stimulating competition in a manner conducive to sound fiscal practices,*' and '*eliminat[ing] favoritism, fraud, and corruption in the awarding of public contracts.*'].)" (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 314 [96 Cal.Rptr.2d 747, 1 P.3d 63], italics added (*Kajima*).)

Simply stated, the implementation of competitive bidding is a fiscal activity which conserves scarce revenues and promotes transparency in government.

---

[CEQA].' (CEQA Guidelines, § 15000.) In interpreting CEQA, we accord the CEQA Guidelines great weight except where they are clearly unauthorized or erroneous. [Citation.]" (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380, fn. 2 [60 Cal.Rptr.3d 247, 160 P.3d 116].)

d. *Case law illustrations: fiscal activity which does not commit a governmental entity to any particular course of action is not a "project" within the meaning of CEQA.*

In *Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464 [11 Cal.Rptr.2d 792] (*Kaufman*), a developer challenged a school district's resolution to establish a community facilities district (CFD) under the Mello-Roos Community Facilities Act of 1982 (Gov. Code, § 53311 et seq.) on the ground the district's formation of the CFD was a "project" within the meaning of CEQA. (9 Cal.App.4th at pp. 468–470.) The CFD was established as a means for raising funds for use in the future to acquire sites for the construction of schools, to lease or purchase portable classrooms and buses, and to rehabilitate future facilities. (*Id.* at p. 468.)

*Kaufman* held the formation of the CFD was not a project within the meaning of CEQA. (*Kaufman, supra,* 9 Cal.App.4th at p. 476.) It noted the absence of a "causal link between the action (formation of CFD 1) and the alleged environmental impact (construction of new schools). . . ." (*Id.* at p. 474.)

*Kaufman* reasoned, "*the formation of the facilities district here will not create a need for new schools.* Nor is the construction of new school facilities entirely dependent upon the formation of CFD 1. Development is already taking place in the area and facilities will (or will not) have to be constructed to accommodate the student population regardless of whether CFD 1 is formed. If CFD 1 fails, the District will have to find some other method to meet its obligation to provide services. [¶] The only foreseeable impact from formation of CFD 1 is that when the District does determine sometime in the future to acquire sites for the construction of schools, to lease or purchase portable classrooms and buses, and to rehabilitate future facilities it will have some of the funds necessary to do so. *When it makes those decisions, which depend in large part on the pattern of development within the District, it will have to examine the environmental impacts.*" (*Kaufman, supra,* 9 Cal.App.4th at p. 474, italics added.)

*Kaufman* further recognized the "need to balance the protection provided by early environmental review against the practical requirement of specific information to permit meaningful environmental assessment. [Citation.]" (*Kaufman, supra,* 9 Cal.App.4th at p. 476.) It reiterated, "formation of CFD 1 does not commit the District to any definite course of action. It does not dictate how funds will be spent, or in any way narrow the field of options and alternatives available to the District. In cases such as this where funding issues alone are involved, courts should look for a binding commitment to spend in a particular manner before requiring environmental review. While

we can envision a situation where a community facilities district might be formed to fund a specific project and therefore trigger the need for CEQA review, that is not the case here. Moreover, environmental review of the District's reports of its future needs would be meaningless. There is simply not enough specific information about the various courses of action available to the District to warrant review at this time." (*Ibid.*)

*Sustainable Transportation, supra,* 179 Cal.App.4th 113, is another CEQA case involving fiscal activity. The issue presented was whether Measure A, a county retail sales and use tax to fund transportation projects, was invalid because it was not preceded by environmental review under CEQA. (179 Cal.App.4th at pp. 115–116.) The lower court denied the CEQA challenge, concluding ". . . Measure A falls within the funding mechanism exclusion of the CEQA Guidelines because it 'does not constitute a binding commitment to construct the projects set forth in the investment plan [(i.e., the expenditure plan)].' " (179 Cal.App.4th at p. 117.)

The reviewing court affirmed, stating: "respondent's actions did not demonstrate that, as a practical matter, it had committed itself to the implementation of the transportation projects in the Investment Plan. Measure A does not qualify as a project within the meaning of CEQA because it is a mechanism for funding proposed projects that may be modified or not implemented depending upon a number of factors, including CEQA environmental review. (CEQA Guidelines, § 15378, subd. (b)(4).)" (*Sustainable Transportation, supra,* 179 Cal.App.4th at p. 123.)

To similar effect is *Citizens to Enforce CEQA v. City of Rohnert Park* (2005) 131 Cal.App.4th 1594 [33 Cal.Rptr.3d 208] (*Rohnert Park*). There, a citizens group sought to force a city to comply with CEQA before entering into a memorandum of understanding (MOU) with an Indian tribe regarding funding of possible public improvements in connection with the development of a casino adjacent to the city. (131 Cal.App.4th at pp. 1597–1598.)

*Rohnert Park* held the MOU was merely a funding mechanism which "sets no time for development and does not obligate the City to undertake a specified construction project. Rather, it is an agreement to establish a source of funds for potential future improvements if the casino project takes place. The MOU specifically acknowledges that CEQA review and compliance may be required if the City ever provides infrastructure related to the casino project. Mere authorization of the funding mechanism set out in the MOU is not a 'project' for purposes of CEQA." (*Rohnert Park, supra,* 131 Cal.App.4th at p. 1601.)

e. *Measure BB merely established a competitive bidding process for future waste services contracts; the new manner of awarding such contracts is a "fiscal activity" which does not involve a commitment to a specific project and therefore does not constitute a project subject to CEQA.*

Guided by the above, we readily conclude Measure BB is not a project under CEQA. Measure BB simply established competitive bidding for future waste services contracts in the City, so as to protect the public fisc. As indicated, competitive bidding promotes " '*sound fiscal practices*' " and also serves to eliminate " 'favoritism, fraud, and corruption in the awarding of public contracts.' " (*Kajima, supra,* 23 Cal.4th at p. 314, italics added, quoting Pub. Contract Code, § 100.) The City's shift to competitive bidding was a *fiscal activity,* which is categorically excluded from the definition of "project." (Cal. Code Regs., tit. 14, § 15378, subd. (b)(4) [project does not include the "creation of government funding mechanisms or other government fiscal activities, which do not involve any commitment to any specific project which may result in a potentially significant physical impact on the environment"].)

Chung argues that Measure BB will result in many more trucks traversing City streets because Measure BB requires the City to award the residential solid franchise to a single franchisee, "but may, at its discretion, award the commercial solid waste Franchise to up to three franchisees." (At present, the City uses a single service provider, Athens, with one set of trucks servicing the entire City.) Chung asserts the award of multiple franchise agreements as of 2017 will result in increased traffic, additional greenhouse gas emissions and other environmental impacts.

Chung's argument is unavailing. At this juncture, the City has not committed itself to any particular course of action. Measure BB does not require the City to select more than one service provider. It may be that after a competitive bidding process, Athens will be awarded both the residential and commercial contracts, resulting in maintenance of the status quo. Further, Measure BB does not preclude the City "from providing solid waste services by itself." (Monterey Park Mun. Code, § 6.09.050(a).)[3] Also, Measure BB enables the City Council to award the franchise to other than the lowest bidder, if it determines the lowest bidder cannot meet material requirements of the franchise. (§ 6.09.070(e).) In addition, Measure BB requires the City Council to hold one or more public hearings "[b]efore deciding whether to grant one or more solid waste franchises . . . ." (§ 6.09.070(b).)

---

[3] All further section references are to the Monterey Park Municipal Code unless otherwise specified.

Thus, at present, it is unknowable which companies may bid on the solid waste franchise, what additional trucks would be required (if any), or what significant impacts the City's choice of service provider(s) may have in 2017. The appropriate time for Chung to raise his environmental concerns would be when a new contract or contracts are under consideration in 2017. At this juncture, environmental review of Measure BB "would be meaningless. There is simply not enough specific information about the various courses of action available to the [City] to warrant review at this time." (*Kaufman, supra,* 9 Cal.App.4th at p. 476.)

*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116 [84 Cal.Rptr.3d 614, 194 P.3d 344], on which Chung places particular emphasis, is easily distinguished. In *Save Tara,* a city conditionally agreed to allow a private developer to redevelop property for senior housing. The agreement was predicated on future compliance with CEQA. (45 Cal.4th at p. 126.) However, because the city already had *committed* itself to the project, *Save Tara* held the city's approval of the project should have been preceded by preparation of an EIR (environmental impact report). In reaching this conclusion, *Save Tara* considered, inter alia, the following factors: (1) the city agreed to initially lend the developer nearly half a million dollars, a promise not conditioned on CEQA compliance (45 Cal.4th at p. 140), and (2) if the city did not give final approval to the project, it would not be repaid. (*Ibid.*) The fatal flaw in *Save Tara* was that the city had "committed itself to a definite course of action regarding the project before fully evaluating its environmental effects." (*Id.* at p. 142.)

In contrast, in the instant case, the City has not committed itself to any particular course of action. Simply stated, Measure BB does not commit the City to any particular course of action once the current contract with Athens expires. Therefore, *Save Tara* has no application to this fact situation.

■ In sum, the trial court correctly determined that Measure BB is not a "project" subject to CEQA review.[4]

### 2. *Trial court properly determined Chung's request for declaratory relief was not ripe.*

By way of background, the City Council's resolution placing Measure BB on the ballot erroneously referred to the proposed ordinance as an "initiative."

Chung pled that by placing Measure BB on the ballot as an "Initiative Measure," when in fact it was nothing more than a municipal ordinance, the

---

[4] Because we conclude Measure BB was not a project, it is unnecessary to address the trial court's alternative ground, i.e., that even if Measure BB were "considered to be a project, the 'common sense' exemption would apply here."

current City Council was purporting to strip a future city council of the ability to amend Measure BB without a vote of the people. Chung sought a judicial declaration that Measure BB should be held unconstitutional insofar as it purported to restrict the discretionary acts of future council members.

In this regard, the trial court ruled: "Measure BB was properly submitted to the voters. The matter was clearly a 'ballot measure' even though some election materials described it as an initiative. The court declines to issue an advisory opinion on whether repeal or amendment of the measure would require voter approval. Until the Council acts to amend or repeal the measure, the controversy is not ripe." The trial court's ruling was proper.

As the trial court found, Measure BB was a ballot measure, not an initiative; Measure BB was submitted to the voters by way of a City Council *resolution* placing the proposed ordinance on the ballot,[5] not by way of an initiative petition. (Elec. Code, § 9201.) The parties agree Measure BB was a ballot measure proposed by the City Council.

Nonetheless, Chung contends that by purporting to place Measure BB on the ballot as an "initiative," the current City Council "is attempting to characterize Measure BB as a true initiative measure in the hope that future city councils will be unable to change or amend the terms of Measure BB without a further vote of the people, thereby attempting to do indirectly what they cannot do directly."

As the trial court found, the controversy is not ripe. The City agrees with Chung that Measure BB was a ballot measure, not an initiative, and that Measure BB may be amended by whatever procedure is applicable to ballot measures.

■ If in the future the City Council seeks to amend Measure BB and the action were challenged as ultra vires, or if a future City Council decided it could not amend or repeal Measure BB on the ground such action was beyond its power, the issue would be ripe. However, at this juncture, there is no proposal to amend or repeal Measure BB. Therefore, Chung's claim with respect to the legislative procedure for amending Measure BB does not

---

[5] Elections Code section 9222, pertaining to submission of a proposition to the voters without a petition, states: *"The legislative body of the city may submit to the voters*, without a petition therefor, a proposition for the . . . enactment of any ordinance, to be voted upon at any succeeding regular or special city election, and if the proposition submitted receives a majority of the votes cast on it at the election, the ordinance shall be . . . enacted accordingly. A proposition may be submitted, or a special election may be called for the purpose of voting on a proposition, by ordinance or resolution. The election shall be held not less than 88 days after the date of the order of election." (Italics added.)

present an actual controversy. (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 606 [79 Cal.Rptr.3d 489] [declaratory relief is appropriate only where there is an actual controversy, " ' "not simply an abstract or academic dispute" ' "].)[6]

## DISPOSITION

The judgment is affirmed. The City shall recover its costs on appeal.

Kitching, J., and Aldrich, J., concurred.

---

[6] Chung contends Measure BB also restricts the discretion of future council members in violation of the Integrated Waste Management Act (the Act) (Pub. Resources Code, § 40000 et seq.), which requires each jurisdiction to divert 50 percent of its solid waste through source reduction, recycling and composting activities. (*Id.*, § 41780, subd. (a)(2).) The argument is meritless. Chung admits Measure BB does not address waste diversion. We conclude Measure BB has no bearing on the City's compliance with its obligations under the Act.