[No. D055310. Fourth Dist., Div. One. June 7, 2010.]

CITY OF SANTEE, Plaintiff and Appellant, v.
COUNTY OF SAN DIEGO et al., Defendants and Respondents;
DEPARTMENT OF CORRECTIONS AND REHABILITATION, Real Party
in Interest and Respondent.

58

COUNSEL

Best Best & Krieger, Michelle Ouellette, Shawn Hagerty and Lindsay D. Puckett for Plaintiff and Appellant.

John J. Sansone, County Counsel, and C. Ellen Pilsecker, Deputy County Counsel, for Defendants and Respondents.

Downey Brand, David R. E. Aladjem and Ellen L. Trescott for Real Party in Interest and Respondent.

OPINION

**BENKE, Acting P. J.**—The California Environmental Quality Act, Public Resources Code section 21000 et seq. (CEQA), requires that public agencies conduct environmental review before they commit themselves to a definite course of action with respect to any project which might have a significant impact on the environment. Such a commitment may occur when an agency makes an agreement with respect to a proposal that, as a practical matter, commits the agency "to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project." (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 139 [84 Cal.Rptr.3d 614, 194 P.3d 344] (*Save Tara*).) On the other hand, when an agency proposes to adopt "a mechanism for funding proposed projects that may be modified or not implemented depending upon a number of factors, including CEQA environmental review," no commitment to the projects has been made and no environmental review is required. (*Sustainable Transportation Advocates of Santa Barbara v. Santa Barbara County Assn. of Governments* (2009) 179 Cal.App.4th 113, 123 [101 Cal.Rptr.3d 371] (*Sustainable Transportation Advocates*).)

Here, a siting agreement under which the County of San Diego (the county) agreed to identify potential locations for a state prison reentry facility in exchange for preference in the award of state financing of county jail facilities was not a commitment to either a reentry facility or any jail facility. The siting agreement did not as a practical matter preclude any alternatives, mitigation measures, or the alternative of not going forward with any facility. Rather, the record shows all the facilities which were the subject of the siting agreement might be modified or not implemented at all, depending on a number of factors, including environmental review. Thus the trial court did not err in sustaining the county's demurrer to City of Santee's (Santee) CEQA petition.

FACTUAL AND PROCEDURAL BACKGROUND

On September 16, 2008, the county entered into the disputed siting agreement with California's Department of Corrections and Rehabilitation (Department of Corrections) under the provisions of the Public Safety and Offender Rehabilitation Services Act of 2007 (Assem. Bill No. 900 (2007–2008 Reg. Sess.)). Under the agreement, the county agreed to identify up to three potential sites in the county for placement of a reentry facility where state prisoners will receive assistance as they transition into society. By way of an exhibit to the siting agreement, the county in fact identified two potential sites for the reentry facility: county-owned land in Otay Mesa and

state-owned land at the Richard J. Donovan Correctional Facility. The agreement provides that if the Department of Corrections selects one of the sites identified by the county as the location for a reentry facility, the county will be given preferential access to $100 million in assistance to finance construction of county jail facilities. The agreement further obligates the county to cooperate with and assist the Department of Corrections in planning, constructing and operating a reentry facility at any location selected by the department. That cooperation includes an agreement to convey any county-owned land at the selected site. Finally, the siting agreement provides the Department of Corrections will conduct an environmental review which complies with CEQA before constructing any reentry facility at a selected site.

The City of Santee (Santee) filed a petition for a writ of mandate against the county. Santee's petition alleged the siting agreement constituted a project which required environmental review because Santee believes the agreement both committed the county to a site for the reentry facility and to expansion of the county's Las Colinas Detention Facility (LCDF), which is located within Santee's city limits. The county filed a demurrer to Santee's CEQA petition, which the Department of Corrections joined. Santee opposed the demurrer, and, as it does on appeal, it argued the county committed itself to the reentry facility by agreeing to convey land to the Department of Corrections and committed itself to the LCDF by effectively eliminating consideration of the Otay Mesa site as an alternative to the LCDF expansion.

The county, the Department of Corrections and Santee each asked the trial court to take judicial notice of a number of documents, including the siting agreement, documents related to a separate environmental review the county was conducting of the LCDF expansion, a letter the Department of Corrections sent the county indicating that there were obstacles to use of the Otay Mesa site, and county documents related to appraisal of and environmental review of the Otay Mesa site and statements from officials which suggested difficulties with the site might be overcome. After consideration of the record, including the documents it judicially noticed, the trial court sustained the demurrer without leave to amend.[1] We affirm.

I

In reviewing the order sustaining a demurrer, we assume the truth of Santee's factual allegations, but not its contentions, deductions or conclusions

---

[1] Santee has moved that we take judicial notice of a number of documents which were not presented to the trial court. We decline to do so. (See *DeYoung v. Del Mar Thoroughbred Club* (1984) 159 Cal.App.3d 858, 863 [206 Cal.Rptr. 28].)

of fact or law. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6 [40 Cal.Rptr.3d 205, 129 P.3d 394]; *County of Fresno v. Shelton* (1998) 66 Cal.App.4th 996, 1010 [78 Cal.Rptr.2d 272].) We also consider any facts which have been judicially noticed. (*Burt v. County of Orange* (2004) 120 Cal.App.4th 273, 277 [15 Cal.Rptr.3d 373].)

We review the court's order declining to give Santee leave to amend for abuse of discretion. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].) With respect to its request for leave to amend, on appeal Santee bears the burden of showing there is a reasonable likelihood it can cure any defects in its petition. (*Ibid.*)

## II

■ " 'With narrow exceptions, CEQA requires an EIR [environmental impact report] whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.]' [Citation.] ' "Approval" means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person.' [Citation.] 'An activity that is not a "project" as defined in the Public Resources Code (see § 21065) and the CEQA Guidelines (see § 15378) is not subject to CEQA. [Citation.]' " (*Sustainable Transportation Advocates, supra*, 179 Cal.App.4th 113, 117, fn. omitted.) In *Save Tara, supra*, 45 Cal.4th at pages 132–142, the court offered significant and controlling elaboration on these general legal principles, which determine when CEQA review is required.

In *Save Tara* the City of West Hollywood entered into a development agreement with respect to a city-owned parcel which was the location of a large residence with some historic significance. Prior to entering into the development agreement, the city advised tenants of the residence they would be relocated, but not for at least a year, and that they would receive relocation assistance. Also prior to entering the agreement with the city, the developers received a large federal grant to finance construction of their proposed low-income housing project on the site, and city officials announced their intention to go forward with the project. Although the development agreement the city entered required the developers to comply with CEQA before commencing construction, the agreement provided the developers with almost $500,000 in nonrefundable financial support and required that the city convey the parcel to the developers when the requirements of CEQA had been satisfied. Given all the circumstances surrounding the development agreement, the court found that as a practical matter the agreement represented a level of commitment to the project which required the city to conduct the environmental review required by CEQA before entering into the agreement. (*Save Tara, supra*, 45 Cal.4th at pp. 141–142.)

In reaching this conclusion, the court noted that although CEQA itself does not specify criteria for determining when an agency must conduct environmental review, the CEQA guidelines (Guidelines), which are entitled to great weight, state: " '[C]hoosing the precise time for CEQA compliance involves a balancing of competing factors. EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment.' (Cal. Code Regs., tit. 14, § 15004, subd. (b).)" (*Save Tara, supra,* 45 Cal.4th at p. 129, fn. omitted.) In light of the Guidelines and the court's view of practicality, the court then went on to reject competing bright-line tests proposed by the parties.

■ On appeal, the city argued that no environmental review was required because its obligation to convey the parcel was subject to the developer's later compliance with CEQA. In rejecting this bright-line test, the court stated: "[W]e have emphasized the practical over the formal in deciding whether CEQA review can be postponed, insisting it be done early enough to serve, realistically, as a meaningful contribution to public decisions. (See *Fullerton* [*Joint Union High School Dist. v. State Bd. of Education* (1982)] 32 Cal.3d [779,] 797 [187 Cal.Rptr. 398, 654 P.2d 168] ['as a practical matter,' school district succession plan was a project requiring review]; *No Oil, Inc.* [*v. City of Los Angeles* (1974)] 13 Cal.3d [68,] 77, fn. 5 [118 Cal.Rptr. 34, 529 P.2d 66] [' "Statements must be written . . . early enough so that whatever information is contained can practically serve as an input into the decision making process." ']; see also *Citizens for Responsible Government v. City of Albany* (1997) 56 Cal.App.4th 1199, 1221 [66 Cal.Rptr.2d 102] [CEQA review should not be delayed to the point where it would 'call for a burdensome reconsideration of decisions already made'].) The full consideration of environmental effects CEQA mandates must not be reduced ' "to a process whose result will be largely to generate paper, to produce an EIR that describes a journey whose destination is already predetermined." ' [Citation.]" (*Save Tara,* 45 Cal.4th at pp. 135–136.)

In addition, the court noted "postponing EIR preparation until after a binding agreement for development has been reached would tend to undermine CEQA's goal of transparency in environmental decisionmaking. Besides informing the agency decision makers themselves, the EIR is intended 'to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action.' [Citations.] When an agency reaches a binding, detailed agreement with a private developer and publicly commits resources and governmental prestige to that project, the agency's reservation of CEQA review until a later, final approval stage is unlikely to convince public observers that before committing itself to

the project the agency fully considered the project's environmental consequences. Rather than a 'document of accountability' [citation], the EIR may appear, under these circumstances, a document of post hoc rationalization." (*Save Tara, supra,* 45 Cal.4th at p. 136.)

Importantly, for our purposes, on the other hand the court also rejected the project opponent's argument "that any agreement, conditional or unconditional, would be an 'approval' requiring prior preparation of CEQA documentation if at the time it was made the project was sufficiently well defined to provide ' "meaningful information for environmental assessment." ' [Citation.] On this theory, once a private project had been described in sufficient detail, *any* public-private agreement related to the project would require CEQA review.

■ "This rule would be inconsistent with the CEQA Guidelines' definition of approval as involving a 'commit[ment]' by the agency. (Cal. Code Regs., tit. 14, § 15352, subd. (a).) Agencies sometimes provide preliminary assistance to persons proposing a development in order that the proposal may be further explored, developed or evaluated. Not all such efforts require prior CEQA review. (See, e.g., Cal. Code Regs., tit. 14, § 15262 [conduct of feasibility or planning studies does not require CEQA review].) Moreover, privately conducted projects often need some form of government consent or assistance to get off the ground, sometimes long before they come up for formal approval. Approval, within the meaning of [Public Resources Code] sections 21100 and 21151, cannot be equated with the agency's mere interest in, or inclination to support, a project, no matter how well defined. 'If having high esteem for a project before preparing an environmental impact report (EIR) nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will be favorably disposed toward it.' [Citation.]

"As amicus curiae League of California Cities explains, cities often reach purchase option agreements, memoranda of understanding, exclusive negotiating agreements, or other arrangements with potential developers, especially for projects on public land, before deciding on the specifics of a project. Such preliminary or tentative agreements may be needed in order for the project proponent to gather financial resources for environmental and technical studies, to seek needed grants or permits from other government agencies, or to test interest among prospective commercial tenants. While we express no opinion on whether any particular form of agreement, other than those involved in this case, constitutes project approval, we take the League's point that requiring agencies to engage in the often lengthy and expensive process of EIR preparation before reaching even preliminary agreements with developers could unnecessarily burden public and private planning. CEQA review

was not intended to be only an afterthought to project approval, but neither was it intended to place unneeded obstacles in the path of project formulation and development." (*Save Tara, supra*, 45 Cal.4th at pp. 136–137.)

■ Rather than adopting either parties' bright-line tests, the court instead adopted the general principle that before conducting CEQA review, agencies must not " 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.' " (*Save Tara, supra*, 45 Cal.App.4th at p. 138.)

"In applying this principle to conditional development agreements, courts should look not only to the terms of the agreement but to the surrounding circumstances to determine whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project. (See Cal. Code Regs, tit. 14, § 15126.6, subd. (e).) In this analysis, the contract's conditioning of final approval on CEQA compliance is relevant but not determinative.

■ "A frequently cited treatise on CEQA (Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (11th ed. 2006)) summarizes this approach in a useful manner. 'First, the analysis should consider whether, in taking the challenged action, the agency indicated that it would perform environmental review before it makes any further commitment to the project, and if so, whether the agency has nevertheless effectively circumscribed or limited its discretion with respect to that environmental review. Second, the analysis should consider the extent to which the record shows that the agency or its staff have committed significant resources to shaping the project. If, as a practical matter, the agency has foreclosed any meaningful options to going forward with the project, then for purposes of CEQA the agency has "approved" the project.' (*Id.* at p. 71.) As this passage suggests, we look both to the agreement itself and to the surrounding circumstances, as shown in the record of the decision, to determine whether an agency's authorization or execution of an agreement for development constitutes a 'decision . . . which commits the agency to a definite course of action in regard to a project.' (Cal. Code Regs., tit. 14, § 15352.)" (*Save Tara, supra*, 45 Cal.4th at p. 139.)

■ Importantly, the court stated: "Our analysis does not require CEQA analysis before a definite project has been formulated and proposed to the agency. An agency cannot be deemed to have approved a project, within the meaning of [Public Resources Code] sections 21100 and 21151, unless the proposal before it is well enough defined 'to provide meaningful information

for environmental assessment.' (Cal. Code Regs., tit. 14, § 15004, subd. (b.).)" (*Save Tara, supra*, 45 Cal.4th at p. 139.)

In finding that under these principles the development agreement represented the city's commitment to the project and hence the need for environmental review under CEQA, the court cited the city's "public announcements that it was determined to proceed with the development of low-income senior housing at 1343 Laurel, its actions in accordance with that determination by preparing to relocate tenants from the property, its substantial financial contribution to the project, and its willingness to bind itself, by the May 3 draft agreement, to convey the property if the developer 'satisfied' CEQA's 'requirements, as reasonably determined by the City Manager.' " (*Save Tara, supra*, 45 Cal.4th at p. 142.)

In *Sustainable Transportation Advocates, supra*, 179 Cal.App.4th 113, the court applied the principles discussed in *Save Tara* to a transportation financing plan approved by a local transportation agency and found that adoption of the financing plan was not a commitment to any of the transportation projects listed in the plan. In *Sustainable Transportation Advocates* the local transportation agency adopted an ordinance which, if approved by voters, would have imposed a half-cent sales tax on county residents. Part of the ordinance included an investment plan which set forth hundreds of millions of dollars of local transportation projects which the agency planned to finance with the tax revenue. However, the court found significant the fact that construction of many of the projects was dependent on obtaining further financing from other agencies, the projects themselves were only described in general terms, the list itself was subject to later amendment, and the projects were subject to CEQA review prior to their construction. (*Sustainable Transportation Advocates, supra*, 179 Cal.App.4th at pp. 119–122.) The court found that under these circumstances and under the principles set forth in *Save Tara*, adoption of the financing ordinance was not a project which required CEQA review. "Unlike City's actions in *Save Tara*, respondent's actions did not demonstrate that, as a practical matter, it had committed itself to the implementation of the transportation projects in the Investment Plan. Measure A does not qualify as a project within the meaning of CEQA because it is a mechanism for funding proposed projects that may be modified or not implemented depending upon a number of factors, including CEQA environmental review. [Citation.]" (*Sustainable Transportation Advocates, supra*, 179 Cal.App.4th at p. 123.)

## III

Here, there is nothing the record which will support the conclusion the siting agreement represents a commitment by either the county or Department

of Corrections to either the reentry facility or the LCDF expansion. First, by its terms the siting agreement does not select any location for the reentry facility and does not make any reference to the LCDF expansion. Importantly, by its terms the siting agreement does not require the Department of Corrections to select any of the locations identified by the county and does not provide the county with any financing preference if none of the county sites are selected.

Admittedly, in the event the Department of Corrections selects a site identified by the county and the county owns the site, the county will be obligated to convey the site to the department. However, this obligation is entirely conditional, and for that reason does not suggest any commitment by the county to any particular site. Indeed, the fact the county also identified a site which it does not own substantially undermines Santee's contention the obligation to convey amounted to any level of commitment to any particular site.[2]

The fact the county identified the Otay Mesa site and that the site might also be an alternative to the LCDF expansion is similarly unavailing. Any impact on the LCDF expansion depends entirely on a determination by the Department of Corrections that the Otay Mesa site is suitable for a reentry facility. The letter from the Department of Corrections pointing out inadequacies in the Otay Mesa site obviously undermines any suggestion the siting agreement made selection of the Otay Mesa site certain or even likely. Any impact on the LCDF expansion would also depend upon a determination the Otay Mesa site was in fact a feasible alternative to the LCDF expansion. However, the draft environmental impact report for the LCDF expansion rejected the Otay Mesa site as suitable for the expansion. In short, on this record identification of the Otay Mesa site had only the most tangential and entirely conditional impact on the LCDF expansion.

---

[2] We also note that before the county conveys the land to the Department of Corrections, the Department of Corrections will be required to meet the requirements of California Code of Regulations, title 14, section 15004, subdivision (b)(1) and (2), which in pertinent part states:

"(1) With public projects, at the earliest feasible time, project sponsors shall incorporate environmental considerations into project conceptualization, design, and planning. *CEQA compliance should be completed prior to acquisition of a site for a public project.*

"(2) To implement the above principles, public agencies shall not undertake actions concerning the proposed public project that would have a significant adverse effect or limit the choice of alternatives or mitigation measures, before completion of CEQA compliance. For example, agencies shall not:

"(A) Formally make a decision to proceed with the use of a site for facilities which would require CEQA review, regardless of whether the agency has made any final purchase of the site for these facilities, *except that agencies may designate a preferred site for CEQA review and may enter into land acquisition agreements when the agency has conditioned the agency's future use of the site on CEQA compliance.*" (Italics added.)

■ Thus, the face of the siting agreement does not require any CEQA review. Indeed, because it does not identify a site for the reentry facility and has no unconditional or certain impact on the LCDF expansion, it does not describe any project which would be subject to any meaningful CEQA analysis. Rather, the face of the agreement places it squarely in the realm of preliminary agreements needed to explore and formulate projects and for which CEQA review would be entirely premature. (*Save Tara, supra,* 45 Cal.4th at p. 139.)

■ Of course, in addition to looking at the face of the siting agreement, we must also examine any circumstances surrounding the agreement which suggest a commitment to proceed with a particular project. (*Save Tara, supra,* 45 Cal.4th at p. 139.) Here, however, there are no such circumstances either alleged in the complaint or otherwise found in the record. We note Santee relies on records which show that during the course of considering the Otay Mesa site, the Department of Corrections has in fact identified water and infrastructure improvements the site would require, determined the cost of the site, and prepared a grading plan and vicinity map for the project. These preliminary steps in no sense represent any commitment to the Otay Mesa site. Rather, on their face they represent no more than the Department of Corrections's attempt to determine whether it should proceed with the site, including the preparation of any required environmental document. Under *Save Tara* environmental review cannot be required where an agency is engaged only in such an exploration and formulation of a potential project. (*Save Tara, supra,* 45 Cal.App.4th at p. 131.)

In this regard, we reject Santee's related contention that the county has unlawfully segmented environmental review of the siting agreement, the reentry facility and the LCDF expansion. While an agency must consider the "whole of an action" (Cal. Code Regs., tit. 14, § 15378, subd. (a)), given the entirely conditional connection between the siting agreement, the eventual construction of a reentry facility, and the LCDF expansion, the county was not required to treat all three projects as a single action which required environmental review. (See *Del Mar Terrace Conservancy, Inc. v. City Council* (1992) 10 Cal.App.4th 712, 734–735 [12 Cal.Rptr.2d 785], disapproved on other grounds in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570–574 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

In sum, because nothing in this record suggests the siting agreement has from a practical perspective foreclosed consideration of alternatives to any project or mitigation measures for those projects, the trial court properly sustained the county's demurrer to Santee's petition. Contrary to Santee's argument, the trial court was not required to wait until the parties had prepared an administrative record before determining whether environmental

review was required. The facts alleged in the petition and the documents which were judicially noticed do not show the county proposed a project within the meaning of CEQA. Santee had access to the records which would have been in the administrative record, and given that access we must presume that if additional facts in the administrative record would have shown a greater commitment on the part of the county, those facts would have been alleged either in the initial petition or by way of a proposed amended petition.

■ Finally, the trial court did not err in declining Santee's request for leave to amend to allege that if the Department of Corrections chooses the Otay Mesa site, it will proceed with the site notwithstanding any environmental review which takes place at that point. Santee's proposed amendment consists of two levels of speculation: it speculates that the Otay Mesa site will be chosen and that the Department of Corrections will not engage in a good faith environmental process at that point in time. While an agency's demonstrable commitment to a project requires environmental review, such double-barreled speculation does not.

Judgment affirmed.

McIntyre, J., and Irion, J., concurred.