Filed 10/28/13; pub.& mod. order 11/22/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

CITY OF IRVINE,

    Plaintiff and Appellant,

       v.

COUNTY OF ORANGE et al.,

    Defendants and Respondents.

G047895

(Super. Ct. No. 30-2012-00538072)

O P I N I O N

          \*            \*            \*

        Appeal from a judgment of the Superior Court of Orange County, Steven L. Perk, Judge. Affirmed.

        Rutan & Tucker, Philip D. Kohn, Jeffrey T. Melching and Michelle Molko for Plaintiff and Appellant.

        Nicholas S. Chrisos, County Counsel, Jack W. Golden, Chief Assistant County Counsel, and Nicole M. Walsh, Deputy County Counsel, for Defendants and Respondents.

                \*            \*            \*

Plaintiff and appellant City of Irvine (Irvine) sued to compel defendants and respondents County of Orange and the County of Orange Sheriff-Coroner (collectively, County) to set aside their decision to approve and submit an application for state funding to expand one of the County's jail facilities. Irvine alleged the County's application constituted a project approval under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA)[1] and therefore required the County to prepare an environmental impact report (EIR) analyzing the County's plans to expand its jail facilities before approving and submitting the application. The trial court disagreed and denied Irvine's petition for writ of mandate.

We affirm. The County's application did not constitute a project approval under CEQA because it did not commit the County to a definite course of action regarding the expansion of its jail facilities. The application was merely a preliminary step in the state process for counties to seek funding for jail expansion. Indeed, the state's process did not require the County to initiate a CEQA review of its expansion plans until after the County submitted its application and received conditional approval to fund the project.

I

FACTS AND PROCEDURAL HISTORY

For more than 40 years, the County has operated the James A. Musick Jail Facility (Musick Facility) on 100 acres of unincorporated land it owns adjacent to Irvine. The facility originally operated as an honor farm and later was expanded to house slightly more than 700 minimum security inmates, but in recent years it regularly has housed more than 1,200 inmates because of a steep increase in the jail population.

---

[1]     All further statutory references are to the Public Resources Code unless otherwise stated.

In 1996, the County prepared Environmental Impact Report No. 564 (EIR 564) for the phased expansion of the Musick Facility to a maximum capacity of 7,584 inmates with the ability to house minimum, medium, and maximum security inmates. The first phase called for the addition of 864 beds. EIR 564 noted the timing and precise phasing for the expansion depended on funding availability. In November 1996, the County certified EIR 564 as complete and adequate under CEQA and the County "approve[d] . . . and authorize[d] the pursuit of funding, the initiation of design, and the construction of the James A. Musick Jail Expansion . . . in accordance with the Master Site Plan."

Irvine sued the County to overturn the decision to certify EIR 564, arguing the report failed to adequately address and mitigate the environmental impacts associated with expanding the Musick Facility. The trial court agreed, ordering the County to (1) vacate its approval of EIR 564 and the Musick Facility expansion plan, and (2) revise EIR 564. The County appealed and this court reversed the trial court's decision, concluding EIR 564 "satisfie[d] all of CEQA's requirements."

While that appeal was pending, the County nonetheless revised EIR 564 to address the trial court's concerns. In October 1998, the County certified the revised EIR 564 and again "approve[d] . . . and authorize[d] the pursuit of funding, the initiation of design, and the construction of the James A. Musick Jail Expansion . . . in accordance with the Master Site Plan." The County did not proceed with the expansion, however, because it lacked funding.

In 2007, the Legislature passed Assembly Bill 900 (AB 900) to provide funding for local jail construction in two separate phases totaling up to $1.2 billion. (Assem. Bill 900 (2007-2008 Reg. Sess.).) In Phase I, AB 900 allowed counties to apply for a portion of approximately $750,000,000. (*Id*. at § 4; see also Govt. Code, § 15820.903.) In Phase II, AB 900 allowed counties to apply for a portion of an additional $470,000,000 after counties reached certain benchmarks under Phase I.

3

(Assem. Bill 900 (2007-2008 Reg. Sess.) § 5; see also Govt. Code, § 15820.913; former Govt. Code, § 15820.918.)

In 2008, the County applied for $100,000,000 under AB 900 Phase I to expand the Musick Facility by adding 1,536 beds. The state conditionally approved the County's application, but the County ultimately declined the funds because of the conditions the state imposed, including a requirement the County pay at least 25 percent of the expansion costs and construct a state reentry facility as part of the project.

In 2011, the Legislature passed legislation to shift responsibility for jailing certain lower level offenders from the state to counties and thereby increased the need for additional space in local jails. (Assem. Bill 109 (2011-2012 Reg. Sess.).) To accommodate this need, the Legislature amended AB 900's Phase II funding provisions. Specifically, the Legislature increased the amount of funds available during Phase II to $602,881,000, eliminated Phase I's requirement that counties reach various benchmarks before receiving state funds, and reduced the counties' required contributions from 25 percent to 10 percent of the project costs. (Assem. Bill 94 (2011-2012 Reg. Sess.) §§ 3, 5; Assem. Bill 111 (2011-2012 Reg. Sess.) §§ 3, 5, 9.)

In October 2011, the County expressed its interest in receiving state funds under AB 900 Phase II and the state invited the County to submit an application. The County's application (hereinafter, Application or Phase II Application) sought $100,000,000 to expand the Musick Facility by adding 512 medium security beds. The Application explained the County was in the master planning and CEQA review stage for its latest version of the Musick Facility expansion and those documents were "mostly completed." The County also explained it anticipated circulating an addendum to EIR 564 as the CEQA document for its Musick Facility expansion.

On December 6, 2011, the County Board of Supervisors passed a resolution "[a]pprov[ing] the attached Request for Application (RFA) and authorize[ing] Sheriff-Coroner Sandra Hutchens to execute the RFA and submit it to the California

4

Department of Corrections and Rehabilitation, Corrections Standards Authority for funding." In the resolution, the Board of Supervisors provided various assurances the state required as part of the Application and resolved to comply with CEQA before accepting any state funds.

In January 2012, Irvine filed this lawsuit seeking a writ of mandate (1) compelling the County to vacate the Board of Supervisors' resolution approving the Phase II Application and (2) enjoining the County from proceeding with the AB 900 Phase II process until the County complied with CEQA. Irvine alleged the County's approval of its Phase II Application was a project approval under CEQA, and therefore the County could not approve the Application until it prepared and certified an environmental impact report or other appropriate CEQA document addressing the current environmental impacts associated with expanding the Musick Facility. The trial court denied Irvine's writ petition and Irvine timely appealed.

We previously granted the County's unopposed request to judicially notice certain facts occurring after the trial court denied Irvine's writ petition. Specifically, the state approved the County's Phase II Application in March 2012 and conditionally awarded funds to the County. In August 2012, the County released for public review and comment a draft of Supplemental EIR 564, which it believed addressed the environmental impacts associated with its latest plans to expand the Musick Facility. In December 2012, the County certified Supplemental EIR 564 as complete under CEQA and approved the 2012 James A. Musick Site and Facilities Master Plan. Shortly thereafter, Irvine filed a new lawsuit challenging the County's decision certifying Supplemental EIR 564 and approving the new master plan for the Musick Facility. That lawsuit remains pending in the trial court.[2]

---

[2] The County argues its approval of Supplemental EIR 564 renders Irvine's appeal moot because the County has now done what Irvine seeks to compel it to do— prepare a CEQA document for the Musick Facility expansion. The County is mistaken.

5

II

DISCUSSION

A.      *Standard of Review*

        Judicial review in any action under CEQA is limited to whether the public agency committed a "prejudicial abuse of discretion." (§ 21168.5.) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (*Ibid*.) "'Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions.' [Citation.]" (*Save Tara*, *supra*, 45 Cal.4th at p. 131.)

        "A claim . . . that the lead agency approved a project with potentially significant environment effects *before* preparing and considering an EIR for the project 'is predominantly one of improper procedure' [citation] to be decided by the courts independently. The claim goes not to the validity of the agency's factual conclusions but to the required timing of its actions." (*Save Tara*, *supra*, 45 Cal.4th at p. 131, original italics.)

_____

The subsequent preparation of an EIR or other CEQA document does not render an earlier lawsuit moot if the plaintiff can still obtain effective relief, which remains viable when no irreversible physical or legal change has occurred. (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 127 (*Save Tara*).) That is the case here because we may still grant Irvine effective relief by ordering the County to vacate its approval of the Phase II Application and reconsider that approval based upon the environmental impacts addressed in an appropriate CEQA document. (*Ibid*.)

6

B.      *The County's Approval of Its Phase II Application Was Not a Project Approval*
        *Requiring CEQA Compliance*

        1.      CEQA Overview

        "Under CEQA, local agencies must prepare or cause to be prepared, certify
as complete, and consider a final EIR *before* approving or disapproving any project they
propose to 'carry out or approve,' if the project may have significant environmental
effects. [Citations.]" (*Neighbors for Fair Planning v. City and County of San Francisco*
(2013) 217 Cal.App.4th 540, 547, original italics (*Neighbors for Fair Planning*).) "An
environmental impact report is an informational document which, when its preparation is
required by [CEQA], shall be considered by every public agency prior to its approval or
disapproval of a project. The purpose of an environmental impact report is to provide
public agencies and the public in general with detailed information about the effect which
a proposed project is likely to have on the environment; to list ways in which the
significant effects of such a project might be minimized; and to indicate alternatives to
such a project." (§ 21061; see also § 21002.1, subd. (a).)

        "'CEQA does not, indeed cannot, guarantee that [governmental] decisions
will always be those which favor environmental considerations.' [Citation.] 'If
economic, social, or other conditions make it infeasible to mitigate one or more
significant effects on the environment of a project, the project may nonetheless be carried
out or approved at the discretion of a public agency if the project is otherwise permissible
under applicable laws and regulations.' [Citation.] 'CEQA recognizes that in
determining whether and how a project should be approved, a public agency has an
obligation to balance a variety of public objectives, including economic, environmental,
and social factors and in particular the goal of providing a decent home and satisfying
living environment for every Californian.' [Citation.] While 'CEQA requires the
decision-making agency to balance, as applicable, the economic, legal, social,
technological, or other benefits . . . of a proposed project against its unavoidable

7

environmental risks when determining whether to approve the project,' 'the adverse environmental effects may be considered "acceptable,"' '[i]f the specific economic, legal, social, technological, or other benefits . . . of a proposal project outweigh the unavoidable adverse environmental effects. . . .' [Citation.]" (*Cedar Fair, L.P. v. City of Santa Clara* (2011) 194 Cal.App.4th 1150, 1174 (*Cedar Fair*).)

### 2. Legal Principles Regarding Project Approvals Under CEQA

CEQA defines a "[p]roject" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency." (§ 21065.) "The term 'project' 'means the whole of an action' [citation] and 'refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies.' [Citation.] It 'does not mean each separate governmental approval.' [Citation.]" (*Cedar Fair*, *supra*, 194 Cal.App.4th at p. 1160; Cal. Code Regs., tit. 14, § 15378, subds. (a) & (c).) "'Approval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." (Cal. Code Regs., tit. 14, § 15352, subd. (a).)

Although Irvine contends the County improperly seeks to piecemeal its environmental review of the Musick Facility expansion by defining the current project as strictly the Phase II Application, the County acknowledges the project for CEQA purposes is the Musick Facility expansion. Indeed, the County's Phase II Application expressly acknowledged the expansion was the project under CEQA and asserted the County would prepare a supplemental document for the expansion. Following the trial court's judgment, the County completed and certified Supplemental EIR 564 to comply with CEQA for the current expansion plan.

8

Here, the dispute focuses on whether the County should have prepared and certified CEQA documentation *before* approving its Phase II Application. Our Supreme Court has long recognized, "[t]he timing of an environmental study can present a delicate problem." (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 797; see also *Save Tara*, *supra*, 45 Cal.4th at p. 130.) CEQA's implementing regulations, the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.), similarly recognize that "[c]hoosing the precise time for CEQA compliance involves a balancing of competing factors. EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment." (Cal. Code Regs., tit. 14, § 15004, subd. (b).) "To be consistent with CEQA's purposes, the line must be drawn neither so early that the burden of environmental review impedes the exploration and formulation of potentially meritorious projects, nor so late that such review loses its power to influence key public decisions about those projects." (*Save Tara*, at pp. 130-131.)

In *Save Tara*, the Supreme Court confronted the question whether a city's conditional development agreement with a private developer constituted an approval requiring CEQA compliance. The developer proposed constructing approximately 35 low-income, senior housing units on city owned property. To help the developer obtain a federal grant for the project, the city granted the developer an option to purchase the property at "'negligible cost.'" (*Save Tara*, *supra*, 45 Cal.4th at pp. 122-123.) After the developer obtained the federal grant, the city approved a conditional development agreement that committed the city to convey its property to the developer and also loan the developer $1 million to "'facilitate development of the project and begin[] the process of working with tenants [who resided on the property] to explore relocation options.'" (*Id*. at p. 124.)

9

The agreement to convey the property and provide a portion of the loan was subject to several conditions precedent, including "that '[a]ll applicable requirements of CEQA . . . have been satisfied, as reasonably determined by the City Manager' and that '[d]eveloper shall have obtained all Entitlements.'" (*Save Tara*, *supra*, 45 Cal.4th at p. 124.) The city's obligation to loan the developer nearly half of the $1 million for "'environmental reports' and 'governmental permits and fees,'" however, was not subject to the CEQA compliance or entitlement conditions and the developer had no obligation to repay that portion of the loan if the city did not finally approve the project. (*Id*. at pp. 124-125, 140.) Before approving the agreement, the city made several public announcements declaring the property will be used as the developer proposed and the city's housing manager explained to the city council "'the recommended action [to approve the agreement] will commit the city as long as the developer delivers.'" (*Id*. at pp. 123, 125.)

A citizens group filed a lawsuit challenging the city's approval of the development agreement because the city did not prepare and certify an environmental impact report before approving the agreement. The group argued any agreement between a governmental agency and a developer is "an 'approval' requiring prior preparation of CEQA documentation if at the time it was made the project was sufficiently well defined to provide '"meaningful information for environmental assessment."' [Citations.]" (*Save Tara*, *supra*, 45 Cal.4th at p. 136.) In opposition, the city argued the development agreement did not constitute an approval under CEQA because it did not irrevocably vest any development rights in the developer. (*Id*. at p. 134.) According to the city, the condition requiring future CEQA compliance eliminated the need to present any environmental documentation before the city approved the development agreement. (*Id*. at p. 132.)

Emphasizing that the CEQA Guidelines defined an approval as "the decision by a public agency which *commits* the agency to a *definite course of action*"

10

(Cal. Code Regs., tit. 14, § 15352, subd. (a), italics added), the *Save Tara* court rejected the parties' bright line positions in favor of an "intermediate position" that examined the totality of the circumstances and the practical effect of the public agency's action on its ability and willingness to modify or reject the proposed project. (*Save Tara*, *supra*, 45 Cal.4th at pp. 132-133, 136, 138.) Specifically, the Supreme Court explained, "[W]e apply the general principle that before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.' [Citations.] [¶] In applying this principle to conditional development agreements, courts should look not only to the terms of the agreement but to the surrounding circumstances to determine whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project. [Citation.]" (*Id.* at pp. 138-139.)

Applying this standard, the *Save Tara* court concluded the development agreement was an approval under CEQA because the "[c]ity committed itself to a definite course of action regarding the project before fully evaluating its environmental effects." (*Save Tara*, *supra*, 45 Cal.4th at p. 142.) Specifically, the court found the following circumstances demonstrated the city was committed to approving the project regardless of what a future CEQA review disclosed: (1) the agreement declared its purpose was to develop the property according to the developer's plans; (2) the city's repeated public pronouncements it was committed to developing the project; (3) the city's commitment to transfer its property to the developer "'at negligible cost'"; (4) the substantial loan commitment the city made to the developer with no obligation to repay nearly half of it if the city did not finally approve the project; (5) the city's commitment to pursue relocating tenants from the property before it finally approved the project; and (6) the CEQA compliance condition merely required preparation of an EIR, but no provision permitted

11

the city to reject the project based on environmental impacts identified in the EIR. (*Id*. at pp. 123, 140-142.)

In *Cedar Fair*, the Court of Appeal applied the principles articulated in *Save Tara* to conclude a city's approval of a term sheet with a private developer for the construction of a proposed professional football stadium was *not* an approval requiring CEQA compliance. (*Cedar Fair*, *supra*, 194 Cal.App.4th at pp. 1155-1156, 1161-1167.) Although the term sheet included a highly detailed description of the proposed stadium and the city already had committed substantial resources to its negotiations with the developer, the term sheet "merely 'memorialize[d] the preliminary terms' [of the proposed stadium project] and only mandate[d] that the parties use the term sheet as the 'general framework' for 'good faith negotiations.' Under the express language of the term sheet agreement, the [city] 'retain[ed] the absolute sole discretion' to make decisions under CEQA, including deciding 'not to proceed with the Stadium project,' and the term sheet create[d] '[n]o legal obligations' 'unless and until the parties have negotiated, executed and delivered mutually acceptable agreements based upon information produced from the CEQA environmental review process. . . .'" (*Id*. at pp. 1167, 1170.) The *Cedar Fair* court concluded the term sheet did not commit the city to the stadium project because the only legal obligation the city assumed was to continue negotiating with the developer, while the city retained complete discretion over all aspects of the CEQA review process. (*Id*. at p. 1170.)

Although *Save Tara* and *Cedar Fair* both involved an agreement between a public agency and a developer regarding a private project, the principles they articulate apply equally to public projects such as the County's Musick Facility expansion. (*Sustainable Transportation Advocates of Santa Barbara v. Santa Barbara County Assn. of Governments* (2009) 179 Cal.App.4th 113, 119-120 (*Sustainable Transportation*); see also *City of Santee v. County of San Diego* (2010) 186 Cal.App.4th 55, 66-68

[applying *Save Tara* principles to decide whether siting agreement between state and county regarding jail project constituted a project under CEQA].)

The County argues the standard articulated in *Save Tara* and *Cedar Fair* requires CEQA compliance only when a public agency enters into a "binding agreement to develop a particular project." (Italics omitted.) The word "binding," however, does not appear in either the *Save Tara* or *Cedar Fair* discussions regarding the controlling standard, nor does it appear in the relevant CEQA provisions or CEQA Guidelines. The controlling standard focuses on the public agency's level of commitment for the project, not whether a binding agreement has been reached. (*Save Tara*, *supra*, 45 Cal.4th at pp. 138-139; *Cedar Fair*, *supra*, 194 Cal.App.4th at p. 1170.) The term sheet in *Cedar Fair* was a binding agreement, but it was not a project approval requiring CEQA compliance because it did not commit the city to the stadium project in a manner that limited the city's discretion under CEQA. (*Cedar Fair*, at p. 1170.) The critical question is whether the totality of the circumstances surrounding the public agency's action has effectively committed the agency to the project even though it has not provided all approvals or entitlements necessary to proceed. A binding agreement certainly can be an important factor, but it is not an essential requirement for a project approval under CEQA.

In determining whether a public agency has effectively committed to a project so as to require CEQA compliance it is important to distinguish between advocating or proposing a project and committing to it. Public entities often are required to provide project approvals for their own public projects and also may partner with developers on private projects. (See *Cedar Fair*, *supra*, 194 Cal.App.4th at p. 1173 ["a local agency may be a vocal and vigorous advocate of a proposed project as well as an approving agency"].) "But 'an agency does not commit itself to a project "simply by being a proponent or advocate of the project. . . ." [Citation.]' [Citation.]" (*Ibid*.; *Neighbors for Fair Planning*, *supra*, 217 Cal.App.4th at p 556-557; *Sustainable*

13

*Transportation*, *supra*, 179 Cal.App.4th at p. 121.) "Approval [under CEQA] cannot be equated with the agency's mere interest in, or inclination to support, a project, no matter how well defined. 'If having high esteem for a project before preparing an environmental impact report (EIR) nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will be favorably disposed to it.' [Citation.]" (*Save Tara*, *supra*, 45 Cal.4th at pp. 136-137; *Neighbors for Fair Planning*, at p. 557; *Sustainable Transportation*, at p. 121.)

Irvine argues CEQA Guidelines section 15004, subdivision (b)(2)(B), provides an alternative standard for determining whether the County's Phase II Application was an approval requiring CEQA compliance because the Musick Facility expansion is a public project. Specifically, Irvine argues that section required the County to comply with CEQA before approving its Phase II Application because the approval gave "impetus" to the expansion project. We reject this argument because it fails to recognize the entire "impetus" standard described in the CEQA Guidelines.

Until a public agency complies with CEQA, Guidelines section 15004, subdivision (b)(2)(B), prohibits the agency from "[o]therwise tak[ing] any action which gives impetus to a planned or foreseeable [public] project *in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project*." (Cal. Code Regs., tit. 14, § 15004, subd. (b)(2)(B), italics added.) Irvine's argument focuses on the word "impetus" without considering the import of the above italicized language in the Guideline. Although "commit[ting]" to a project (*Save Tara*, *supra*, 45 Cal.4th at p. 139) is different than giving an "impetus" to a project (Cal. Code Regs., tit. 14, § 15004, subd. (b)(2)(B)), both standards require that the public agency's action "preclude" or "foreclose[]" any alternatives or mitigation measures that CEQA would otherwise require the agency to consider. (*Save Tara*, at p. 139; Cal. Code Regs., tit. 14, § 15004, subd. (b)(2)(B).) As we explain below, we conclude the County's Phase II Application did not effectively preclude it from considering any alternatives or

14

mitigation measures that CEQA would otherwise require the County to consider and therefore the result is the same under both standards.

3.      The County's Phase II Application

Irvine contends the County's decision to approve its Phase II Application and authorize the Sheriff-Coroner to submit the Application to the state constituted an approval triggering the County's obligation to comply with CEQA. Accordingly, *Save Tara* and *Cedar Fair* require us to examine the terms of the County's Application and the surrounding circumstances to determine whether the Application committed the County to the Musick Facility expansion in a manner that effectively precluded it from considering any project alternatives or mitigation measures under CEQA. (*Save Tara*, *supra*, 45 Cal.4th at pp. 138-139; *Cedar Fair*, *supra*, 194 Cal.App.4th at p. 1170.) The surrounding circumstances include the detailed process the state established for counties to apply for and obtain state funding under AB 900.

Certain state statutes and regulations guided the AB 900 process. The "Request for Applications" inviting the County and others to apply for AB 900 Phase II funds further described that process. (Govt. Code, §§ 15820.90 et seq. [AB 900 Phase I], 15820.91 et seq. [AB 900 Phase II]; Cal. Code Regs., tit. 15, § 1700 et seq. [procedures for both AB 900 Phase I and Phase II].) The procedure required the County to submit a statement notifying the state the County was interested in receiving Phase II funds, a detailed application describing the County's need to expand its jail facilities, a description of the proposed expansion project, the budget and construction plans for the project, and the County's plan for operating the new facility. (Cal. Code Regs., tit. 15, § 1730.1.)

The state's Request for Applications made clear the County would receive only a "conditional award" if the state approved the County's application. The Request for Applications emphasized, "A county's receipt of a conditional award for state

15

financing, as described herein, does not guarantee the awarded county will receive any reimbursements . . . . The conditional award is merely an expression that the county is qualified, at this point, to move forward in the process."[3] (Capitalization omitted.) Accordingly, the County's Phase II Application was merely a preliminary step that, if approved by the state, would authorize the County and the state to explore and evaluate the possibility of expanding the Musick Facility. (Cal. Code Regs, tit. 15, §§ 1730.1, 1747, 1748, 1748.5, 1749.)

Under the state's process, the County, not the state, is designated as the lead agency responsible for complying with CEQA. (Govt. Code, § 15820.911, subd. (f); Cal. Code Regs., tit. 15, § 1751, subd. (c).) The County therefore is the public agency with discretion to determine whether and how to mitigate any significant environmental impacts associated with the Musick Facility expansion and which alternatives, if any, to consider or adopt during the CEQA process. (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 903-904 ["'The lead agency must *independently* participate, review, analyze and discuss the alternatives in good faith.' . . . As the process continues, 'the lead agency may determine an environmentally superior alternative is more desirable or mitigation measures must be adopted'" (original italics)].) Accordingly, the state's AB 900 process does not limit the County's discretion to consider and impose mitigation measures or project alternatives, but rather affirms the County's authority to do so.

---

[3] The Request for Applications also explained an award is "'conditional' in that [it is] predicated, at a minimum, on the requirements that: (1) each county's project be approved by the [Corrections Standards Authority] at various stages throughout the planning and construction . . . ; (2) each county's project receive appropriate review and approvals through the State capital outlay process; (3) each selected county enters into the state/county agreements as required; and (4) lease-revenue bonds are sold for each selected project."

16

More importantly, the state's Request for Applications declared the AB 900 process did not require the County to even initiate CEQA review until *after* the state approved the County's Application and the County received a conditional award. The state did not require any form of CEQA documentation as part of the County's Phase II Application. (Cal. Code Regs., tit. 15, § 1730.1.) Although the state requires the County to comply with CEQA, the state's tentative project schedule described in the Request for Applications does not require the County to provide documentation of CEQA compliance until approximately one year after receiving its conditional award.[4] (Cal. Code Regs., tit. 15, § 1747, subd. (a)(7).)

After receiving a conditional award, the County still must (1) work with the state to complete the County's master plan for the proposed jail facility; (2) conduct a CEQA review to identify and analyze the project's environmental impacts and possible means to avoid or minimize those impacts; (3) negotiate and enter into contracts with the state defining each side's roles, responsibilities, and performance standards; (4) provide

_____

[4]     The short time period the state gave counties to submit their Phase II applications leads us to question whether a county feasibly could have complied with CEQA before submitting its application. (See *Save Tara*, *supra*, 45 Cal.4th at p. 134 [recognizing as a practical matter that some initial project activities may need to be conducted before completing CEQA analysis]; Cal. Code Regs., tit. 14, § 15004, subd. (b) ["EIRs and negative declarations should be prepared as early as feasible in the planning process"].) The state established a two-phase process for counties to apply for Phase II funds. First, it required the county to submit an interest statement by October 21, 2011. Second, if the state invited the county to apply for funds based on its interest statement, the county had to submit a detailed application by January 11, 2012, describing the county's need for additional jail facilities, an estimated budget, a description of the proposed scope of work, a construction and administrative work plan, and an estimated timetable for completing the project's major phases. (Cal. Code Regs., tit. 15, § 1730.1, subd. (a).) The state's Request for Applications explained the state established this two-step process to prevent counties not likely to be awarded funds from needlessly expending resources in preparing the detailed application. This likely explains why the state decided not to require counties to initiate CEQA review until after they received a conditional award.

all necessary local approvals for the project; and (5) obtain state approval for the final construction plans. (Govt. Code, § 15820.911; Cal. Code Regs., tit. 15, §§ 1747, 1748, 1748.5, 1749.) If the County makes it through this elaborate process, it may seek state reimbursement for authorized costs up to the amount of the conditional award. The state does not advance the funds, but rather approves requests for reimbursement for specified expenditures. (Cal. Code Regs., tit. 15, § 1756.)

The AB 900 process distinguishes this case from *Save Tara* because its Phase II Application committed the County to nothing. In *Save Tara*, the city's development agreement with a private developer and numerous surrounding circumstances demonstrated the city's commitment to the developer's project even though the agreement was conditioned on future CEQA compliance. The agreement committed the city to conveying its property to the developer, loaning the developer $1 million (half of which would *not* be repaid if the city did not finally approve the project), and relocating tenants who lived on the project site before the city even approved the development. The *Save Tara* court found the CEQA compliance condition was essentially meaningless because it merely required the preparation and certification of an EIR without reserving the city's power to modify or reject the project based on the impacts identified in the EIR. (*Save Tara*, *supra*, 45 Cal.4th at pp. 140-142.)

Here, we address an application for funding under a state program that allows the County, if its application is approved, to take the next step in the process. The Application does not commit the County to proceed with the application process or the Musick Facility expansion. Moreover, the County did not seek to defer environmental review of the proposed project by conditioning its Application on future CEQA compliance. Rather, AB 900 did not require the County to even initiate CEQA compliance until later in the process, but nonetheless designated the County as the lead agency with discretion to identify, select, and impose the mitigation measures and project alternatives it deemed appropriate. Nothing in the County's application, or the state's

18

later conditional award to the County, committed the County to the Musick Facility expansion in a manner that effectively precluded the County from considering any project alternatives or mitigation measures that CEQA otherwise required. Accordingly, we conclude the County's Application is analogous to the term sheet in *Cedar Fair* because it did not commit the County to anything. At most, it permitted the County to explore the possibility of using state funds to expand the Musick Facility.

Irvine fails to identify any aspect of the state process or the County's Application that committed the County to expanding the Musick Facility simply by submitting its Application to the state. Irvine contends the assurances the state required the County Board of Supervisors to make in its resolution approving the Application show the County "did much more than authorize the submittal of an application." Specifically, Irvine points to the Board of Supervisors' resolution assuring the state that the County (1) "will adhere to State requirements and terms of the agreements between the County [and the state]"; (2) "has appropriated, or will appropriate after notification of conditional award of financing . . . the amount of contribution identified by the County on the financing program application form"; (3) "will safely staff and operate the facility that is being constructed . . . within ninety (90) days after project completion"; (4) "has project site control . . . and will not dispose of, modify the use of, or change the terms of the real property title . . . without permission and instruction from the [state]"; and (5) the real property to be used has a current fair market value of $37.8 million and "$11[ million] of the land value has been identified as the County . . . in-kind match." These assurances, however, simply do not commit the County to proceeding with the project. They merely assure the state that if the County's Application is approved, and if the County decides to proceed, the County has the ability to do so and will follow the State's procedures.

We note the County made these same assurances (and others) when the Board of Supervisors authorized the submission of an application for funding during

19

AB 900 Phase I.  The state approved the County's Phase I application based on these assurances and conditionally awarded the County the $100 million it requested.  The County, however, later turned down that conditional award and declined to proceed with the jail expansion described in the earlier application because the County disliked the conditions the state imposed on the provisional award.[5]  The state established the same process for awarding funds under both AB 900 Phase I and Phase II (Cal. Code Regs., tit. 15, § 1700 et seq.) and therefore the County's decision and ability to turn down the earlier funding, despite making the same assurances on which Irvine now relies, shows those assurances in no way committed the County to the project described in its Phase II Application.

As a practical matter, Irvine argues the County committed itself to the Musick Facility expansion described in its Phase II Application because the County already has dedicated substantial resources to that expansion plan and therefore it is unlikely the County would decline $100 million from the state when the County has repeatedly acknowledged its significant need to expand its overcrowded jails.[6]  Under *Save Tara* and *Cedar Fair* we have considered the practical effect of the County's actions and conclude the County has not committed itself to the Musick Facility expansion to the degree required to transmute the Application into an approval under CEQA.

---

[5]     Irvine argues the County's decision to turn down the Phase I funding is irrelevant and does not show the County will do so again.  But the significance of the County's decision to turn down the Phase I funding is not to show that it will turn down the Phase II funding, but that it has the right and ability to do so.  The County's right and ability to walk away speaks to the commitment requirement and is a factor properly considered in deciding whether the County committed itself to a particular course of action by simply applying for funding.

[6]     Irvine argues the County committed substantial financial resources in identifying the land to be used for the proposed expansion, but the identified land already is used as a jail and has been for more than 40 years.  Nothing in the County's proposal to use the land in that fashion amounts to an approval for CEQA purposes.

As explained above, a public "'agency does not commit itself to a project "simply by being a proponent or advocate of the project . . . ." [Citations.]' [Citation.]" (*Cedar Fair*, *supra*, 194 Cal.App.4th at p. 1173.) Similarly, the County's commitment of both human and financial resources to developing the current expansion plan and preparing the Phase II Application does not demonstrate the commitment required to transform the Application into an approval requiring CEQA compliance. In *Cedar Fair*, the city spent over $1 million working on the proposed stadium project with the private developer and anticipated spending at least another $1 million, but the court concluded "those expenditures do not establish any legal commitment to any feature of the project that effectively foreclosed meaningful environmental review." (*Cedar Fair*, *supra*, 194 Cal.App.4th at pp. 1172-1173; see also *Neighbors for Fair Planning*, *supra*, 217 Cal.App.4th at pp. 556-557.)

Finally, Irvine repeatedly points to the high level of detail the County provided regarding its current Musick Facility expansion plan in the Phase II Application. According to Irvine, the County's detailed and elaborate expansion plans provide meaningful information for environmental assessment and therefore the County was required to prepare a CEQA document before approving the Application. The amount of detail or the advanced stage of the project's design, however, covers only part of the analysis for determining whether an agency's action constitutes an approval under CEQA. An approval under CEQA requires both a definite course of action and a commitment to that definite course of action. (Cal. Code Regs., tit. 14, § 15352, subd. (a); *Save Tara*, *supra*, 45 Cal.4th at pp. 132-133, 136, 138; *Cedar Fair*, *supra*, 194 Cal.App.4th at pp. 1167-1171.) As explained above, the commitment element is lacking here.

Accordingly, we agree with the trial court that the County's approval of its Phase II Application was not a project approval requiring CEQA compliance. This conclusion eliminates the need to address the various other challenges Irvine asserts to

21

the County's Application because those challenges are predicated on the assumption CEQA applied to the County's approval of the Application.

## III

### DISPOSITION

The judgment is affirmed.  The County shall recover its costs on appeal.


ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CITY OF IRVINE, | G047895 |
| Plaintiff and Appellant, | (Super. Ct. No. 30-2012-00538072) |
| v. | ORDER MODIFYING OPINION AND GRANTING REQUEST FOR PUBLICATION; NO CHANGE IN JUDGMENT |
| COUNTY OF ORANGE et al., | |
| Defendants and Respondents. | |

It is ordered that the opinion filed in the above-entitled matter on October 28, 2013, is hereby MODIFIED as follows:

1.      On page 8, at the end of the last paragraph on the page, beginning with "Although Irvine contends the County," the following footnote is added as footnote 3:

> [3]      Whether a supplemental EIR is the appropriate form of CEQA documentation for the County's current Musick Facility expansion plans and the legal sufficiency of Supplemental EIR 564 are not raised on this appeal.  We therefore express no opinion on those issues.

23

2. The number for all subsequent footnotes is increased by one.

Pursuant to California Rules of Court, rule 8.1105(c), and for good cause shown, nonparty California Building Industry Association's request to publish the opinion is GRANTED. The opinion is ordered published in the Official Reports. (Cal. Rules of Court, rule 8.1105(b).)

The foregoing modification does not change the judgment.


ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.

24